THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* RICHARD C. ROBINSON, Appellant.

Argued April 16, 1940; decided October 8, 1940.

*John  W. Hollis* for  appellant.

*Norman  G.  Stagg,  District  Attorney,*  for  respondent.

LEWIS, J. The defendant-appellant, a security salesman, stands convicted of grand larceny in the first degree. According to the indictment the larceny occurred when the defendant, without the consent of the owner thereof, appropriated to his own use the sum of $600 which had been intrusted to him as bailee or agent by his client, Miss Lillie Happy. At that time the defendant's business, which he and his wife formerly conducted as a partnership, had been incorporated under the name of "R. C. Robinson Securities Corporation," with its principal office at Ithaca, New York.

For several years prior to 1934, Miss Happy, a woman then more than seventy years of age, had dealt with the defendant in the purchase of securities. Her transactions with him were not numerous but involved separate purchases in connection with which she had paid to him amounts which totaled $1,261.50. Of that total sum she testified: " He took that to invest for me, and to do with it as well as he could, to bring in the best returns for me."

Without dwelling on their earlier dealings, we pass at once to a transaction which occurred in September, 1934, a month after the incorporation of the defendant's business and which immediately preceded the acts for which he has been held criminally responsible. The defendant then had in his possession seventy-five shares of Bankers' National Investment Corporation stock, owned by Miss Happy, which he used as payment for ten shares of the preferred stock of R. C. Robinson Securities Corporation. The proof of this transaction was afforded by two written memoranda — one in the handwriting of the defendant, which purports to be an agreement by Miss Happy to purchase ten shares of R. C. Robinson Securities Corporation preferred stock

at $100 per share. This memorandum, dated September 15, 1934, bears the name of Lillie Happy printed in pencil, to the left of which and under the printed word " witness " the defendant wrote his initials " R. C. R." The other memorandum is also in the defendant's handwriting and purports to acknowledge receipt from Miss Happy of seventy-five shares of Bankers' National Investment Corporation stock in payment for " equal value shares " of R. C. Robinson Securities Corporation stock. Miss Happy testified that she had no recollection of purchasing ten shares of the stock of the defendant's corporation or that she had ordered the defendant to do so.

Upon the trial this transaction was traced through to the preferred stock book of R. C. Robinson Securities Corporation, from which it appeared that the ten shares of preferred stock thus purchased by the defendant for Miss Happy were represented by stub No. 15 from which the corresponding stock certificate No. 15 had been detached. Then followed proof that although stub No. 15, from which the corresponding certificate had been detached, bears the name of Lillie Happy in the defendant's handwriting, the certificate No. 15, originally attached thereto, had been issued to the defendant " R. C. Robinson." When the defendant was asked by his counsel to explain why certificate No. 15 for the ten shares of preferred stock sold to Miss Happy had been issued in his name he testified that, in line with common practice in such transactions, he had issued the stock certificate in his own name to obviate the necessity of his going to Bovina Center, where Miss Happy lived, to secure her indorsement upon the certificate for transfer in the event a sale, exchange or other disposition of the stock should take place.

Such an event did take place shortly thereafter in the form of the transaction which has led to the defendant's indictment and conviction. On December 31, 1934, when the books of the R. C. Robinson Securities Corporation showed that Miss Happy owned ten shares — or, as the record states, " $1,000 worth " — of the corporation's pre-

ferred stock, the defendant informed the witness Dunbar, who was then the assistant treasurer of the corporation, that Miss Happy was in need of money for the repair of a barn or farm buildings and that she "needed $400 of the stock redeemed." Thereupon, in accord with the defendant's direction, a check in the amount of $400 was drawn, payable to his order. Eleven days later, on January 11, 1935, the defendant again called into his office the assistant treasurer and stated to him that Miss Happy "needed the $600 balance which was left." A check in the amount of $600 was then drawn to the order of the defendant who in turn delivered to the assistant treasurer preferred stock certificate No. 15 which bore the defendant's name. The assistant treasurer then wrote across the certificate the word "canceled" and affixed it to stub No. 15 in the stock book. The $600 check which thus came into the hands of the defendant was at once deposited to the credit of his personal account in which at the time was a balance of $28.39. Against the increment afforded by the deposit of $600, the defendant promptly proceeded to make disbursements for his personal debts.

Miss Happy testified that she owned no barn and that she had never told the defendant she needed money for the repair of farm buildings. When the defendant was questioned by his own counsel, "Do you know the fact she [Miss Happy] did not have any barn at that time?" he replied, "I knew it very well." And when asked, "Do you know whether you told him [Mr. Dunbar] she wanted to repair a barn or not?" the defendant answered, "No."

The defendant did not deny that he put to his own use the avails of the check for $600 to which reference has been made. His defense was that at the time the two checks for $400 and $600 were prepared he had two Starrett Investing Corporation bonds which he valued at approximately $1,000, as to which he then made a written memorandum "that they were for Miss Happy." According to his testimony, the memorandum was "either attached to or lying with" the bonds which he left "in one of the safes.

I do not remember which. Or possibly in the bank. I did not keep watch of them." " Q. And were those bonds still in that office when you left there? A. It was my understanding they were, yes. Q. Had you ever disposed of them in any way? A. I had not." He also told the jury that he first learned that Miss Happy had not received the Starrett bonds when the indictment upon which he has been convicted was returned against him in November, 1937.

Meantime the affairs of R. C. Robinson Securities Corporation had come under the surveillance of the Attorney-General, who, in an action instituted by him against that corporation and others, secured a court order on October 28, 1935, appointing a receiver who promptly took possession of the property and affairs of the corporation. The receiver testified that although there were several Starrett bonds among the securities of which he took possession under court order, he found nothing to indicate that Lillie Happy had an interest in any of them.

We are told in support of the defendant's position that the facts outlined above and others too numerous for recital here did not warrant a finding against the defendant of criminal guilt. It is said that the transaction which led to the defendant's indictment left him and his client in the relation of debtor and creditor to be dealt with by civil law without interference by criminal authorities. We must reject such a view, believing as we do, that in the evidence brought together by the prosecutor, which the jury chose to believe, there are the elements of grand larceny, first degree — the application by the defendant to his own use, without the owner's consent, of funds in excess of $500 belonging to Miss Happy and then being in his control as her bailee or agent. (Penal Law, §§ 1290, 1294.) He possessed himself of her funds which she had intrusted to him for purposes of investment; he used those funds without her consent, for another and unrelated purpose — the payment of his personal obligations. What was said in *People* v. *Meadows* (199 N. Y. 1, 6) applies with equal force to the facts now before us: " The criminal act in this case was committed, and the criminal intent evidenced, when, depart-

ing from his duty to use the moneys in paying for the stock, the defendant diverted it to other purposes."

But it is now suggested that if any money was stolen by the defendant, it was not the money of Lillie Happy but was the money of the defendant's corporation. The record facts and applicable law afford several answers to such a suggestion but the complete and practical answer is that throughout the trial and in both the opening and the summation by his counsel the defendant admitted that it was *he* who owed Miss Happy money — not the corporation. Indeed the record shows that when the defendant, upon his direct examination, was asked to give a conversation he had with Miss Happy one week before the trial he stated: " She [Miss Happy] said she would like to have the money that I owed her, and I told her I would like to give it to her. I said ' If we can arrange some solution of this thing where we are not going to be all tied up on it, I would be very glad indeed, and will anyway to the best of my ability, see that you get back the money you entrusted to *me.*' * * * At the time I was there I had intended paying her a portion of what *I* owed her and giving her my father's note, the way we originally talked." And again when this subject became a matter of cross-examination, the following testimony was given by the defendant: " Q. How much money do *you* owe Lillie Happy? A. I believe the figure is twelve hundred and some odd dollars. Q. *You* do owe her that money, don't *you?* A. Certainly *I* do owe it to her. Q. And you said to her ' I will give you the money that you entrusted to *me* ' didn't you? A. That is correct. Q. You have not done it, have you? A. I have not." (Emphasis supplied.)

No suggestion was made to the jury on the facts or to the trial justice on the law that the funds appropriated by the defendant belonged to the corporation. In reaching a decision in this case upon the law we may not acquit the defendant by resting a conclusion to that end upon a view as to established facts not shared by the defendant upon the trial. " A controversy put out of the case by the parties is not to be put into it by us." (*Martin* v. *Herzog,* 228 N. Y. 164, 167.)

∎

We cannot agree with the defendant's assertion that his rights were prejudiced by the receipt in evidence of Exhibit 50, a written memorandum prepared by the assistant treasurer in 1935 shortly after the receiver took charge of the corporation's property and affairs. This item of proof was offered by the prosecution as a means of showing to whom the Starrett bonds belonged of which the receiver took possession. It was prepared by the assistant treasurer who, as a witness for the defendant, upon cross-examination, gave independent testimony from his personal knowledge of the facts contained within the memorandum which had a direct bearing upon the defendant's claim that he had set aside two of the Starrett bonds for Miss Happy and that before the receiver took possession they had been earmarked as her property. The assistant treasurer testified that he " did practically all " the buying of securities for R. C. Robinson Securities Corporation and that he had the securities in his charge after they were delivered. He had personal knowledge of the bonds in the possession of the corporation at the time of the receivership and stated from memory that the number of Starrett bonds was sixteen — fourteen of which then belonged to John and Mittie Weaver and two belonged to John D. Robinson. He testified that Exhibit No. 50 was prepared by him in November, 1935, as a record of the numbers of the two bonds owned by John D. Robinson and used, with other collateral, in arranging a bank loan for John D. Robinson. The arranging of such loan was not a corporation matter but a personal transaction between the defendant and John D. Robinson. In view of this testimony by the assistant treasurer and other testimony by the same witness which fully explain facts set forth in Exhibit 50, we do not regard as prejudicial the receipt in evidence of that exhibit.

Nor does the record warrant the criticism of the trial justice which has been made for an alleged failure to submit to the jury as a question of fact whether the relationship between the defendant and Miss Happy resulting from the transaction here involved was that of debtor and creditor. We find in the body of the charge a sufficient presentation of this question to the jury.

Other errors assigned by the defendant have been examined by us with care. In no instance do we find an error which was prejudicial to the defendant's rights.

The judgment should be affirmed.

RIPPEY, J. (dissenting). Defendant was convicted on an indictment containing two counts each charging him with the crime of grand larceny in the first degree. The first count charges him with the felonious appropriation on January 11, 1935, of the sum of $600 which he then had " in his possession, custody and control as bailee, servant, attorney, agent, clerk and trustee of one Lillie Happy," said sum then being her property. The second count sets out certain specific acts which are alleged to arise out of and constitute a part of the same transaction as specified and set out in the first count. The indictment, in fact, contains but one charge and was so treated at the trial. That is necessarily so since there is no evidence to sustain the theory of the second count standing by itself. The theory there set out is that *a specific sum of money* belonging to Lillie Happy, first in the possession of the partnership of R. C. Robinson & Company, then in the possession of the R. C. Robinson Securities Corporation, and definitely earmarked as her money, was converted and misappropriated by defendant. Upon that theory, neither the indictment when read as a whole nor separately by count could be sustained.

It appears that Lillie Happy, a woman about seventy-five years of age at the time of the trial, first met defendant sometime between 1927 and 1929 when he was a salesman for a brokerage concern of Binghamton, N. Y., and purchased through him and that concern $4,000 worth of securities of an offering made by Clarence Hudson & Company, New York city brokers. Subsequently, at least, she had stock and security dealings with other stock salesmen and brokers and she had other investments not made through defendant. In 1932 defendant opened an office in Ithaca, N. Y., to deal in the Hudson Company offerings on his own account under the firm name of R. C. Robinson &

Company, of which he was the principal partner. The partnership business continued until August, 1934. In October and November, 1933, Miss Happy turned over to defendant $1,025 which he invested in Collateral Bankers' bonds. Later the bonds were sold by him. She gave him an additional $236.50, which made the aggregate sum of $1,261.50 of her money in his hands. That sum he invested in Bankers' Industrial Investing Corporation Class A stock, a Hudson offering, certificates for which were issued in her name and delivered to defendant. Although she says that she was not advised at the time of the making of that particular investment for her and knew nothing of it specifically, it is not asserted that defendant made any improper use of the money. She authorized him to invest it and handle any of such investments from it and change her securities at his option in any manner he saw fit. Subsequently she was notified of the making of the investment and indorsed the stock in blank for transfer. She left the stock in defendant's hands. The transactions were partnership affairs and the stock remained with the partnership as a partnership account. She testified that she did not know of subsequent transfer of securities or of investments made for her or on her account by defendant but she authorized the making of them and subsequently by her conduct ratified them. She received interest on those securities from the partnership while the partnership handled the account and a dividend from the Robinson Corporation on the subsequent investment in stock as later noted.

In August, 1934, the partnership business was incorporated under the name of the R. C. Robinson Securities Corporation and the business, assets and accounts of the partnership were turned over to the corporation. The corporation thus acquired or subsequently had some thirty employees, at least three branch offices, a large volume of business and a large number of brokerage accounts and upwards of 700 satisfied customers. Defendant was president of the corporation. The Lillie Happy account and securities were among those

turned over to the corporation. In the early part of September, 1934, the stock then standing in her account was sold by the corporation for $1,087.50, which amount was deposited in the general checking account of the corporation at the First National Bank of Ithaca, N. Y., and she was credited on the books of the corporation with that sum less $5.25 taxes or a net sum of $1,082.25. Her account, as shown by the corporation books, was then debited with the sum of $1,000 which represented the purchase price of ten shares of the preferred capital stock of the R. C. Robinson Securities Corporation of the par value of $100 per share and a balance unused of $82.50 appears as a credit balance in her favor. The stock, however, was issued by the corporation in the name of the defendant and not in the name of Lillie Happy. The District Attorney asserts that the stock was, in fact, her property. The defendant so concedes and the evidence conclusively establishes it to be the fact. There was subsequently paid to her by the corporation and she received and accepted on October 10, 1934, one dividend on the stock. Such was the status of her account on December 31, 1934, and of her security holdings so far as defendant and the corporation are concerned. To that point no irregular dealings by the corporation or by defendant with her money or property are charged. None appears in the evidence. The relations and dealings between defendant and Miss Happy were by her authorization and approval and entirely satisfactory to her.

The alleged larceny occurred later. On December 31, 1934, the assistant treasurer of the corporation, upon the request of defendant who represented that Miss Happy needed money, issued a check on its general account in the First National Bank of Ithaca to the order of defendant for $400, and on January 11, 1935, another check for $600, both of which checks defendant deposited in his own personal account at the same bank and the proceeds were used by him to pay his own personal obligations, whereupon the assistant treasurer procured the stock certificate and canceled it on the books of the company.

It is the position of the prosecution that the stock belonged to Miss Happy although not issued or registered in her name, that the money derived from the redemption of the stock by the corporation was her money and that defendant feloniously appropriated the same to his own use. On the merits, defendant asserts, *first*, that, at the most, only a relation of debtor and creditor existed between Miss Happy and himself and that the transaction furnished no basis for criminal prosecution against him; *second*, if there was any theft at all, it was from the corporation and not from Miss Happy, and, *third*, that he substituted and deposited with the corporation other securities as he had authority to do to replace the canceled stock. He urges that the indictment should have been dismissed but, if not, that substantial errors occurred on the trial which entitled him to a new trial.

Upon the conceded or undisputed facts, it seems to me that, if any money was stolen by defendant, it was not the money of Lillie Happy, but was the money of the corporation. It was and is the theory of the prosecution, as stated in the brief of the District Attorney, that the indictment taken as a whole charges larceny by a trustee of a specific item of property belonging to Miss Happy, to wit, the sum of $600. Concededly, defendant came rightfully into possession of her money in 1933 and subsequently rightfully invested and reinvested it for her in the Bankers Collateral bonds, in the Class A stock of the Bankers' Industrial Investing Corporation and in the preferred capital stock of the R. C. Robinson Securities Corporation. The investments were first made by and carried on the books of the partnership and subsequently by, and on the books of, the latter corporation. When the R. C. Robinson Corporation was organized, her investment in the Bankers' Industrial Investing Corporation Class A stock became a corporate account and the stock was carried in its portfolio as her stock. The money she gave Robinson in 1933 had lost its identity as her money long prior to the date of the alleged larceny. In September, 1934, the corporation had

possession of the stock certificates indorsed by her in blank. When that stock was sold by the corporation, the check of the purchasers was made payable to the corporation, not to defendant, and the corporation collected the money on the check and deposited it in its general bank account. When the sale of those securities was closed and the moneys received, the corporation, not defendant, owed Miss Happy $1,082.25, the selling price of the stock. The obligation of defendant to Miss Happy, if any, arose not because he personally had any money of hers in his possession but on another basis entirely. He had no money belonging to her at that time in his possession. In the event of loss on investments, defendant was bound by the agreement between Miss Happy and himself to reimburse her to the extent thereof. Partially to satisfy its obligation, the corporation charged her on its books with $1,000 for the purchase price of ten shares of its own preferred capital stock. No money passed at any time from Miss Happy to the corporation. The corporation had in its possession no special fund earmarked as belonging to her. If any loss occurred for any reason whatsoever on account of that investment, the corporation may have been civilly liable. As between defendant and Miss Happy, defendant was liable only in a civil suit therefor, not on the basis of conversion but because of his guaranty to her against loss. When the corporation redeemed its own stock, its own checks on its own general account were issued and payment thereof was made out of its own general funds. Whether those checks were made payable to defendant or to any other person, its obligation to Miss Happy was not satisfied until she got the money. The corporation had definite notice that the stock belonged to her and acknowledged its debt to her. The account stood in her own name on its books. Out of it she had not authorized the corporation to pay any money to Robinson or to any one else. The payment of the $1,000 to Robinson did not satisfy the corporation debt to her, in whole or in part, no matter what representations Robinson made to the assistant treasurer to

induce him to issue the checks. The bank account out of which the checks were cashed in December, 1934, and January, 1935, respectively, contained thousands of dollars of money belonging to it and to numerous of its customers, mixed and not separately earmarked for anybody. But it did not contain one dollar of money belonging to Miss Happy unless it was the balance of $82.25 to her credit on the corporation books, but even that had long since been mixed in the general corporation bank account with its other general funds and its identity had long since disappeared. What the corporation got for the stock it redeemed was a credit on Miss Happy's account of $1,000, not cash in hand. Miss Happy had nothing to do with the issuance of the checks or with the money obtained when they were cashed. She knew nothing of the transaction. It was the money of the corporation which defendant procured on misrepresentations of fact and used for his own purposes and not the money of Miss Happy which he is charged in the indictment with having feloniously appropriated to his own use. If defendant was trustee as to that particular money for any one, it was for the corporation and it was the money of the corporation that he misappropriated. The motions of defendant to dismiss the indictment on the ground that the People failed to prove the commission of the crime charged in the indictment should have been granted.

Nevertheless, if the refusal to dismiss the indictment on the above ground was not erroneous, numerous errors were committed on the trial of such gravity and so prejudicial to the rights of defendant that they cannot be overlooked.

The evidence is susceptible to no interpretation other than that Miss Happy turned over her money to defendant in 1933 to use and invest and reinvest as he saw fit. He had authority to invest it for her in the Collateral Bankers' bonds, in the stock of the Bankers' Industrial Investing Corporation and in the stock of the R. C. Robinson Securities Corporation, to use it whenever and however he saw fit in connection with any investment he might select,

to substitute securities at will and generally to handle it in his sole discretion for her benefit. He guaranteed to reimburse her for any loss that might occur in such investments. She supervised or directed none of the investments. She said she had no thought that he stole any of her money and that she believed she had the right to hold him civilly for loss in investments and intended to hold him therefor in the event any loss occurred. Up to December, 1934, there is no evidence of any intent on his part to steal her money and nothing irregular is claimed in his dealings with it. All of that is from her own testimony. There is nothing to the contrary. Defendant testified to like effect. On the basis of the agreement made between Miss Happy and him, defendant claimed that any liability that existed against him arose only out of their relationship of debtor and creditor. He admitted that he owed her money in the event that loss occurred in the investments and was liable therefor on demand provided it should be held that he had not substituted and placed in the possession of the corporation securities in place of the stock. No demand for the return of any money was proven or claimed to have been made. Additionally, it might again be noted that he was not directed to invest the fund in any specific security or keep the fund intact. In fact, the fund was turned over to him for general investment purposes and not to be supervised or controlled by Miss Happy. He had no duty to hold the money intact in specific currency. He was specifically not to do that. He was not required to keep an equivalent fund available at all times for her use. On all the facts it appropriately might be found that the deposit with him was general, not specific, and that the only relation that existed was that of debtor and creditor. If such were the situation and that relation existed, there could be no larceny, at least, unless the money was not returned upon demand. Although the issue could not be decided, on the record, as one of law, and the weight of evidence might indicate a trust relation between defendant and her or between defendant and the corporation, there

was evidence to support defendant's claim. It clearly raised an issue of fact sharply litigated from the beginning to the end of the trial and discussed in the summaries. Even though its weight was sufficient only to raise a reasonable doubt as to defendant's guilt, that would have been sufficient to require defendant's acquittal. The court, however, submitted no such claim or issue to the jury. Defendant then attempted to get the issue before the jury by requests to charge but without success, and refusal to submit the issue or to charge as requested, protected by exceptions, presents reversible error.

Defendant presented another defense which would have compelled an acquittal had the jury found the evidence sustained it. For that defense he relied mainly on his own testimony that, although he did take and use the cash received from the sale of Lillie Happy's stock, he did so because it belonged to him, since he substituted for the stock sold two Starrett Investing Corporation bonds from his personal holdings as indicated by an appropriate notation made at the time on the records of the R. C. Robinson Securities Corporation. Defendant's failure to produce the entries made was explained by the fact that some three years and a half prior to the trial an injunction proceeding was commenced by the Attorney-General in which a receiver was appointed who took possession of all of the books and effects of the corporation. Over defendant's objection and exception, rebuttal testimony was allowed to be elicited by the District Attorney from two of defendant's witnesses to the effect that the records of the R. C. Robinson Securities Corporation indicated ownership of all of the sixteen Starrett bonds found by the receiver among the effects of the corporation in persons other than Lillie Happy or the defendant. The records described as *indicating* the ownership of the bonds were not produced nor was any attempt made to explain the failure to do so. These witnesses were thus allowed to testify as to their opinions and conclusions on the very question which the jury was to decide, viz., whether or not the defendant transferred certain bonds to Lillie

Happy's account as shown by a notation on the records of the corporation. This evidence also flagrantly offends against the best evidence rule, for, certainly, the records themselves were the best evidence of what they contained or *indicated* (3 Black. Comm. 368; *Butler* v. *Mail & Express Publishing Co.*, 171 N. Y. 208, 211; *Mahaney* v. *Carr*, 175 N. Y. 454, 462; *Trombley* v. *Seligman*, 191 N. Y. 400, 403; Code Crim. Proc. § 392). Equally inadmissible, for the same reasons, was a record received in evidence as Exhibit 50 which purported to show the name, numbers and the names of the owners of the bonds found by the receiver when he took over. Concededly, this record was not a corporate record but was prepared by an assistant to the receiver at the request of the receiver subsequent to the defendant's severing of his connections with the corporation from information purported to be contained in the books and records of the corporation which were not produced.

It is urged that no prejudice resulted from the admission of this evidence for the reason that one witness testified to the same facts from his own personal knowledge and recollection. A comprehensive search of the record has failed to reveal such testimony. On the contrary, it appears that all testimony concerning the ownership of the bonds was limited to what it was claimed the records showed. It is true that the bookkeeper, who was also an officer of the corporation, testified from personal knowledge as to certain transactions involving two Starrett bonds, but subsequently he denied any personal recollection as to the identity of the two bonds in question. It cannot be said that the erroneous admission of this evidence did not affect the substantial rights of the defendant. Conviction or acquittal depended on whether the jury believed the testimony of the defendant on a crucial point in the case and incompetent evidence was admitted to contradict him.

In reversing another conviction of this same defendant under a different indictment this court pointed out that questions concerning irregularities and other larcenies uncovered in an investigation into the defendant's business

affairs were incompetent and prejudicial (*People* v. *Robinson*, 273 N. Y. 438, 445). An exactly similar error is present in the record now before us. Here, the bookkeeper was allowed to testify, over the defendant's objection and exception, that when he returned to the office after having been absent on a vacation for some time, he discovered that defendant's accounts were short. No logical or evidentiary connection has been or can be shown between that larceny, if it was one, and the one for which the defendant was on trial. The evidence appears to have been admitted solely to prove the defendant's propensity for irregularities and larcenies in the conduct of his business.

Many other errors are alleged upon this appeal. Some are so substantial as to merit serious consideration. However, without further considering them, it seems clear to me that the errors above discussed are so substantial and prejudicial that they cannot be overlooked and warrant a reversal of the judgment appealed from and the granting of a new trial, although I am personally of the opinion that, on the ground first above stated, the indictment should be dismissed and the defendant discharged.

LEHMAN, Ch. J., LOUGHRAN, SEARS and CONWAY, JJ., concur with LEWIS, J.; RIPPEY, J., dissents in opinion, in which FINCH, J., concurs.

Judgment affirmed.